FIRST NATIONAL BANK, APPELLANT, v. BLAIR STATE BANK ET AL., APPELLEES.

FILED DECEMBER 18, 1907. No. 15,027.

Statute of Frauds: SALES: SUBSEQUENT PURCHASER. When a vendor of chattels by a contract voidable by the statute of frauds makes a subsequent valid sale or pledge and delivery of the same chattels to a third person, he thereby repudiates and avoids the former contract, and the subsequent purchaser may invoke the statute for his own protection.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. Affirmed.

Thomas Stapleton, James H. Van Dusen and W. C. Lambert, for appellant.

F. A. Brogan and Herman Aye, contra.

AMES, C.

In June, 1900, Mrs. L. F. Armstrong was the owner or in the possession of a cattle ranch and engaged in the live

stock business at Elm Creek in Buffalo county, in this state. On the 30th day of that month she executed two mortgages on parts of her herd, one which became the property of the First National Bank of Marengo, Iowa, and the other the property of the Blair State Bank of Blair, in this state. Her business seems to have been in the charge of her husband. At any rate counsel for both parties to this suit treat him as her *alter ego* and impute his conduct to her unqualifiedly. On the morning of the 30th day of November, 1903, an officer and agent of the Marengo bank visited Elm Creek, and had there an interview with the husband with reference to the first mentioned indebtedness. At that time there were no cattle on the ranch answering to the description contained in the mortgage, but there were 40 odd head of cattle upon the premises and belonging to Mrs. Armstrong, which were described in the mortgage owned by the Blair bank, and 83 head belonging to her and not incumbered. It was agreed between Armstrong and the representative of the Marengo bank that the 83 head should be delivered to the latter, and be by him shipped to South Omaha and sold upon the market, and the proceeds of the sale applied toward the satisfaction of the indebtedness held by him. Elm Creek is situated on the line of the Union Pacific Railroad Company about 16 miles west of Kearney, but cars for the proposed shipment could not then be obtained at either place, and on the afternoon of the same day Delaney, the agent, returned east in quest of them. Nothing was paid in consideration of the agreement and none of the cattle were delivered to Delaney, and no written memorandum was made, but it was agreed that the cattle should remain in the custody of Mrs. Armstrong and be cared for by her husband, as had formerly been the custom, until they should be taken under the agreement. In the afternoon of the same day Armstrong visited Kearney. In the morning of that day the Blair bank had retained Robbins, an attorney at Kearney, and had instructed him in general

terms to look after their interests as the owner of the other mortgage and indebtedness belonging to it. Armstrong, upon his arrival in Kearney, met Robbins and told him in substance of the arrangement between the former and Delaney. The value of the cattle in the possession of the mortgagor and answering the description in the mortgage of the Blair bank was insufficient to satisfy the debt secured by that instrument, and Robbins asked Armstrong to make good the deficiency in part by delivering to him for his client the 83 head of the unincumbered cattle which were the subject of the agreement between Armstrong and Delaney. With this request Armstrong was reluctant to comply, mentioning as an obstacle to so doing that he did not intend to return at once to Elm Creek. To obviate this objection Robbins suggested that Armstrong write a note to his wife instructing her to deliver the animals, which he finally consented, or seemed to consent, to do, and he wrote and sealed a note, which he addressed to his wife and entrusted to Robbins for delivery. The contents of the note are not disclosed by the evidence, but Robbins gave it to an assistant named Swan, who on the next day, December 1, carried it to Elm Creek and delivered it to Mrs. Armstrong, and then, with the help of a hired man of the latter, drove the cattle from the pasture into a corral or feed lot, in which he fastened, fed and kept them for four or five days without objection from the Armstrongs, at the end of which time, and also without such objection, he shipped them to South Omaha, consigned to the Blair State Bank, where they were sold on the market, and the proceeds of the sale appropriated by that institution in part satisfaction of its demand. It does not appear that the Armstrongs or either of them have in any manner or at any time since the interview with Robbins been ignorant of, or have objected to, this transaction in any particular, but they appear to have silently acquiesced therein. This action was begun in May, 1904, and tried in April, 1906, upon an amended petition alleging a sale and delivery of the cattle to the

Marengo bank by L. F. Armstrong and a subsequent wrongful seizure and conversion of them by the Blair bank. The answer, besides a general denial, alleges owner- ship of the cattle in the defendant by reason of the trans- action above set forth, and as a separate defense pleads the statute of frauds as against the alleged purchase by the plaintiff. There was a trial to a jury, and a directed verdict and judgment for the defendant, and the plaintiff appealed.

There is no contradiction in the evidence and no dispute of law, except as to the availability of the statute of frauds as a defense for the defendant bank. In other words, it is not disputed that the statute would have been a complete defense for Mrs. Armstrong to a similar action by the Marengo bank against her, or that in such an action she might have waived the statute, and that in that event the transaction between her husband and Delancy would properly have been adjudged sufficient to transfer the title to the Marengo bank, by which she would have been con- verted into a mere custodian of the cattle for it. Neither is it disputed that the protection of the statute extended, or would have extended, to any one who was by contract privy with her in title. This latter proposition seems also to have been set at rest by the previous decisions of this court. *Hansen v. Berthelsen,* 19 Neb. 433; *Dailey v. Kins- ler,* 35 Neb. 835. The reason for this latter rule was, we think, concisely and correctly stated by the supreme court of Indiana in *Hunter v. Bales,* 24 Ind. 299, as follows: "The vendor makes his election to treat the prior verbal contract as void, whenever he makes a valid agreement of sale in the face of it, and that the intermediate purchaser, in such a case, is shielded by the statute, as well as the vendor." The principal, if not sole, ground of contention by counsel for the plaintiff, if we correctly understand him, is that Robbins' authority as agent and attorney for the defendant extended only to enforcing the mortgage of his client against the property described therein, and that the transaction by which he obtained possession of

the cattle in question, even if he had the consent thereto of the Armstrongs, which is denied, was in excess of his powers, and consequently ineffectual to transfer the title to the Blair bank. Granting such to have been the situation at the time he took possession of the animals, which we do not decide, that act was not one in its nature unlawful, but was one for the benefit and in furtherance of the interests of his client, which the latter was at liberty to, and which it in fact did, ratify and confirm before the plaintiff made any attempt to intervene or effectually to impeach it. As respects Armstrong, we have the uncontradicted testimony of Robbins that at the time of the interview in Kearney the former consented to turn over the cattle to him for the satisfaction of his client, and that in connection with such consent he wrote and addressed the note to his wife, in apparent compliance with which her employee assisted in making the transfer, to which she or her husband never made objection, though both had ample opportunity so to do before the cattle were shipped away. The evidence, to our minds, appears so conclusively in favor of the defendant in this respect that, in our opinion, a verdict in favor of the plaintiff could not be permitted to stand.

It is immaterial whether the transaction was a pledge or a sale, or whether it was consummated by the delivery to Swan or by subsequent ratification and acquiescence, or what was the scope of Robbins' powers as agent or attorney. In any event, the title passed before the plaintiff intervened, and the defendant was and is rightfully and lawfully in the possession of the cattle and of the proceeds of their sale. When a vendor of chattels by a contract of sale which is voidable by the statute of frauds makes a sale or pledge and delivery of them to a third person, he thereby repudiates and avoids the former contract, and the subsequent purchaser may invoke the statute for his own protection. *Hunter v. Bales, supra; Petty v. Petty,* 4 Mon. (Ky.) 215.

We do not consider that *Rickards v. Cunningham,* 10

Neb. 417, and *Cresswell v. McCaig*, 11 Neb. 222, cited by the plaintiff, are in point. In both of these cases the party seeking the protection of the statute was a creditor claiming adversely to both the vendor and the vendee. It is true that the defense of the statute of frauds is a personal one, but it is so in a sense somewhat different from that in which the term is used in some other instances, as, for example, the case of usury. It is free from the same degree or kind of moral obligation as that which affects the latter, and a third person, who by a voluntary and valid contract with the vendor succeeds to the title and possession of the latter, succeeds also to his right to protect that title against a previous void or voidable agreement.

We recommend, therefore, that the judgment of the district court be affirmed.

FAWCETT and CALKINS, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.